Lisa **GAGLIARDI**, Appellant,

v.

**ORTHO–MIDWEST, INC., Respondent.**

No. A06–1318.

Court of Appeals of Minnesota.

June 19, 2007.

Steven Andrew Smith, Adam A. Gillette, Nichols Kaster & Anderson, PLLP, Minneapolis, MN, for appellant.

Stephen G. Andersen, Jennifer J. Kruckeberg, Ratwik, Roszak & Maloney, P.A., Minneapolis, MN, for respondent.

Considered and decided by ROSS, Presiding Judge; KALITOWSKI, Judge; and HALBROOKS, Judge.

## OPINION

ROSS, Judge.

This case requires us to decide whether a saleswoman who worked for an orthopedic-devices distributor has raised facts suf-

ficient to preserve her workplace sexual-harassment and retaliation claims for submission to a factfinder. Lisa Gagliardi appeals from the district court's grant of summary judgment in favor of her former employer, Ortho–Midwest, Inc. The district court dismissed her lawsuit after it concluded that Gagliardi did not present facts sufficient to sustain her claims of sexual harassment or retaliation by Ortho–Midwest. It also concluded that Ortho–Midwest is not liable for the alleged harassment by the employees of Aircast, Ortho–Midwest's client. We hold that the district court appropriately dismissed Gagliardi's claims of harassment arising from the alleged conduct of Aircast employees and her claim of retaliation. But we hold that the disputed facts, construed in the light most favorable to Gagliardi's claims, may allow a factfinder to find that Ortho–Midwest, through the conduct of its sole owner, subjected Gagliardi to a hostile work environment in violation of the Minnesota Human Rights Act. We therefore affirm in part and reverse in part.

## FACTS

Lisa Gagliardi's harassment and retaliation claims arise from conduct that she alleges occurred during her approximately six weeks of employment at Ortho–Midwest, Inc., from January 15 to February 28, 2005. Ortho–Midwest, a manufacturer's representative solely owned by Craig Carlander, sells Aircast orthopedic devices and products. The alleged illegal conduct involved personnel at Ortho–Midwest and Aircast, Ortho–Midwest's largest client. Carlander hired Gagliardi to sell Aircast and other products to hospitals and physicians in Minnesota and to assist Carlander with maintenance and reporting requirements for the product lines. Ortho–Midwest engaged independent contractors to sell in other regions. Ortho–Midwest has no sexual-harassment policy, no employee

handbook, and no human-resources personnel. Employment-related complaints must therefore be made to Carlander. Carlander had an informal agreement with his sales representatives, which she claims he described as, "You don't sue me, I don't sue you."

Beyond indicating that she would be required to travel extensively with Carlander, Carlander did not give Gagliardi a specific explanation of her job expectations, goals, or duties. Following Carlander's suggestion, Gagliardi spoke with a former female sales representative to learn more about the job. According to Gagliardi, the former representative told her that the job had few expectations and no sales goals. She warned Gagliardi to be very firm with Carlander to reject his sexual advances.

During her brief employment at Ortho–Midwest, Gagliardi took four business trips, three of them with Carlander. Gagliardi claims that she was subjected to sexually inappropriate comments and groping by Aircast employees during her first business trip with Carlander. She asserts that Carlander made inappropriate romantic or sexual advances and inappropriately touched her during their second trip together. And she claims that Carlander's unwelcome romantic or sexual conduct continued during her third and final business trip with him. She points to other statements and conduct by Carlander to support her allegations of pervasive and severe sexual harassment. Gagliardi told Carlander about one of the incidents of alleged harassment by an Aircast employee, and her boyfriend complained directly to Aircast about romantic emails Gagliardi had been receiving from another Aircast employee. Over about a four-day period at the end of February 2005, Carlander attempted by electronic mail and telephone to contact Gagliardi regarding specific

work assignments, requesting her response. Gagliardi did not respond, and, on the evening of February 28, Carlander terminated her employment.

Gagliardi sued Ortho–Midwest under the Minnesota Human Rights Act, alleging that she was the subject of sexual harassment that created a hostile work environment based on the actions of three Aircast employees and Carlander. She also alleged that Ortho–Midwest retaliated against her because of her boyfriend's report complaining about the alleged harassment by Aircast employees. The district court granted summary judgment, determining that Gagliardi failed to prove a prima facie case of sexual harassment, that she failed to prove that her termination was illegal retaliation, and that Ortho–Midwest had a legitimate nondiscriminatory reason for terminating her employment, which she could not show was a pretext for retaliation. This appeal follows.

## ISSUES

I. Did the district court err by granting summary judgment and dismissing a discharged employee's claims of sexual harassment by her employer's client and her supervisor?

II. Is a report of alleged incidents of sexual harassment conduct protected by the Minnesota Human Rights Act when the report is made by a third-party nonemployee?

## ANALYSIS

Summary judgment is proper when, based on the pleadings, discovery, and affidavits filed with the court, there are no genuine issues of material fact and either party is entitled to judgment as a matter of law. Minn. R. Civ. P. 56.03. On appeal from summary judgment, we review de novo whether there are any genuine issues of material fact and whether the district

court erred in its application of the law. *Prior Lake Am. v. Mader*, 642 N.W.2d 729, 735 (Minn.2002). No genuine issue of fact exists when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *DLH, Inc. v. Russ*, 566 N.W.2d 60, 69 (Minn. 1997) (quotation omitted). A court deciding a summary-judgment motion, either in the first instance or on appeal, may not weigh the evidence or determine credibility. *See id.* at 70 (stating that court should not weigh evidence); *Forsblad·v. Jepson*, 292 Minn. 458, 459–60, 195 N.W.2d 429, 430 (1972) (stating that court should not determine credibility). Instead, we must view the evidence in the light most favorable to the party against whom the district court granted summary judgment. *Fabio v. Bellomo*, 504 N.W.2d 758, 761 (Minn. 1993). We apply this standard first to Gagliardi's sexual-harassment claims and then to her retaliation claim.

## I

Gagliardi argues that the district court mistakenly concluded that she failed to establish a prima facie case of sexual harassment. She asserts that the district court failed to construe disputed facts in a light favorable to her claims and made unfavorable credibility determinations. Viewing the evidence in the light most favorable to Gagliardi, we find that she has not established a prima facie case of sexual harassment with respect to her allegations involving the Aircast employees, but that she has with respect to those involving Carlander.

The Minnesota Human Rights Act prohibits sexual harassment as a form of employment discrimination. Minn.Stat. §§ 363A.03, subd. 13, 363A.08, subd. 2(3) (2006). Sexual harassment includes "unwelcome sexual advances, requests for sexual favors, sexually motivated physical con-

tact or other verbal or physical conduct or communication of a sexual nature." *Id.* § 363A.03, subd. 43 (2006). Both parties agree that to prevail on her claim of sexual harassment creating a hostile work environment, Gagliardi must show that:

> (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on membership in a protected group; (4) the harassment affected a term, condition or privilege of her employment; and (5) the employer knew of or should have known of the harassment and failed to take appropriate remedial action.

*Goins v. West Group,* 635 N.W.2d 717, 725 (Minn.2001).

■ To be actionable, the sexual harassment must have been so severe or pervasive that it altered the conditions of employment and created an abusive work environment. *Id.* We determine whether an environment is sufficiently hostile or abusive to support a claim by viewing "the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Wenigar v. Johnson,* 712 N.W.2d 190, 207 (Minn.App.2006) (quotation omitted). Although isolated instances of harassment may seem inconsequential, taken together they may demonstrate a course of conduct that creates a hostile environment. *Giuliani v. Stuart Corp.,* 512 N.W.2d 589, 594 (Minn.App.1994).

### Aircast Employees' Alleged Sexual Harassment

■ Gagliardi introduced her deposition testimony as evidence that three Aircast employees made sexually inappropriate comments to her and that one physically assaulted her during her first business trip with Carlander to San Diego. An employer may be held liable for the sexual harassment of its employees by nonemployees, including customers, when the employer is aware of the harassment but fails to take timely remedial action. *Costilla v. State,* 571 N.W.2d 587, 592 (Minn. App.1997), *review denied* (Minn. Jan. 28, 1998). The legislature amended the definition of sexual harassment in 2001 by deleting the provision that "in the case of employment, the employer knows or should know of the existence of the harassment and fails to take timely and appropriate action." 2001 Minn. Laws ch. 194, § 1. Gagliardi footnotes this change but continues to argue, as she did in the district court, that Ortho–Midwest is liable for the conduct of the Aircast employees because it should have known of their sexual harassment. She implies but does not argue that Ortho–Midwest may be strictly liable for the actions of the Aircast employees. It appears that the amendment merely moves the knowledge-and-response element from a plaintiff's prima facie case to an employer's affirmative defense, tracking developments in federal discrimination law. *See Pennsylvania State Police v. Suders,* 542 U.S. 129, 143–46, 124 S.Ct. 2342, 2352–54, 159 L.Ed.2d 204 (2004) (describing the holdings of *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). But we need not decide the full import of the amendment because actions of Aircast personnel trigger the analysis we established in *Costilla* as it regards harassment by nonemployees. Under *Costilla,* which presents the basis for employer-harassment liability in third-party cases, Gagliardi must show that Ortho–Midwest actually knew about but failed to remedy the alleged harassment. *Costilla,*

571 N.W.2d at 592. She did not make this showing.

◼ In the first incident, Gagliardi introduced her own testimony that an Aircast sales representative whispered to her in crude terms during dinner, saying that women with thin lips perform the best oral sex. Gagliardi soon left the table. The next evening she reported this incident to Carlander, who reported it to the Aircast vice president of human resources the following morning. Gagliardi alleged no later offensive conduct by this Aircast employee. Ortho–Midwest promptly addressed the single comment appropriately, and this incident cannot form the basis of liability against Ortho–Midwest.

◼ In a second incident, Gagliardi asserts that another Aircast sales representative came to her hotel room ostensibly to provide her with business information. This representative allegedly took obvious romantic interest in Gagliardi; he told her that they made a cute couple and that he was very attracted to her, and he sat beside her at every meeting they both attended, even moving Carlander's things to do so. Gagliardi asserts that once he was inside her hotel room, the representative put his arms around her and started kissing her. She pushed him away. He told her that when she spoke in his ear during the earlier meeting he "got a hard-on." She claims that he then touched her buttocks underneath her dress and groped her breasts. Gagliardi told him to leave, but he left only after she agreed that she would go for a walk on the beach with him later. Gagliardi did not report the incident to Carlander or to Aircast, claiming now that she was too overwhelmed and embarrassed to do so. She nonetheless had a duty to alert Carlander to the harassing conduct. *See Williams v. Missouri Dep't of Mental Health,* 407 F.3d 972, 977 (8th Cir.2005) (holding that em-

ployee is required to notify employer of any alleged sexual harassment or hostility, despite employee's subjective fears of confrontation or unpleasantness). An employer cannot be liable for harassment by third parties when the harassed employee conceals the harassment, and so this incident also cannot support Gagliardi's harassment claim.

◼ Gagliardi alleges that on the next night, a third Aircast employee—production manager Ron McNeill—approached her from behind in a lounge and told her that she looked "delicious." Gagliardi did not report this comment to Carlander or to Aircast. After Gagliardi returned from San Diego, McNeill emailed and telephoned Gagliardi many times, including on Valentine's Day, expressing his romantic interest in her. Gagliardi did not tell Carlander about McNeill's communications, purportedly because she knew that Carlander and McNeill were friends. Gagliardi now strongly emphasizes McNeill's romantic interest in her, and she claims in her brief to this court that she "tried to keep [McNeill's emails] on a friendship level." She tells this court that she "was unsuccessful" in her efforts to keep his communication platonic, that she would refuse to answer McNeill's calls, and that she considered his electronic letters to be "inappropriate." Gagliardi's brief even quotes segments of McNeill's often lengthy and plainly romantic emails, and she includes the full text of 14 of them in her appendix. Looking only to her appellate submissions, Gagliardi's claims that McNeill pestered her with a unilateral romantic interest would appear to be overwhelmingly supported. This is key, because only his unwelcome sexual attention would constitute sexual harassment. Minn.Stat. § 363A.03, subd. 43 (defining sexual harassment as "unwelcome" conduct); *Cummings v. Koehnen,* 568 N.W.2d 418, 424 (Minn.1997)

(emphasizing that conduct alleged as sexual harassment must be unwelcome).

But absent from Gagliardi's brief, and absent from her appendix, is any reference to *Gagliardi's own lengthy emails and voicemail messages* to McNeill. We have reviewed the communications that Gagliardi chose not to present to us, and they tell a very different and complete story.

Far from suggesting that Gagliardi did not welcome McNeill's romantic prose, as her brief and selective appellate submissions would indicate, her replies obviously invite and encourage his sexual interest in her and gushingly declare her interest in him. For example, Gagliardi left McNeill a voicemail message late on a Sunday night in which she said, "I apologize for not giving you a call Friday.... I am still trying to find some time where I can actually sit down and respond to all of your wonderful messages that you sent me. There's no way I am going to be able to even sound near as ... linguistic and beautiful as you do." She requested that he help secure sales territory for her in Salt Lake City, quipping, "Be my sugar daddy. Come and see me." She told him she would "try to contact [him] tomorrow," and encouraged him to "feel free to call me any time." In another voicemail message, Gagliardi told McNeill that she "absolutely loved the message" that he sent her, and she explained that she felt "nothing would have been better than to walk on the beach" in San Diego with him. She told him, "it would be great to hear from you," and volunteered, "I'm completely free if you want to call my cell phone, and I would love to talk to you." She referred to his maudlin, romantic emails as "masterpiece letters."

Gagliardi not only implied that she was interested in McNeill beyond friendship, she encouraged his reciprocal interest by insisting that she was glad that he had told her, "I should feel lucky that you are interested in me." She flirted, "I like the thought that I am the only [woman involved in an email romance with you]." She consistently invited his emotional replies to her, noting, "[I] am listening, and waiting for more," among other enticements. She urged him, "Your messages just put me in a trance and send me to a different, more calm, world." And she flattered, "I am wondering what triggered this interest in me—you are such a sophisticated, worldly man. To me, you are genuine, caring, intriguing, very handsome, and intelligent." She referred to him as "sexy." Rather than to suggest the slightest offense concerning McNeill's now allegedly sexually harassing interaction with her during and after the trip, Gagliardi wrote, "I enjoyed the encounters we had in San Diego and find myself thinking how we could see each other again."

The decision by Gagliardi's counsel to omit from the briefs to this court *any* reference or minor hint as to Gagliardi's seductive emails and phone messages to McNeill is troubling in light of counsel's bald representation that "Gagliardi tried to keep [McNeill's emails] on a friendship level. Unfortunately, Ms. Gagliardi was unsuccessful." It is not difficult to conceive why Gagliardi "was unsuccessful" at keeping McNeill's communications "on a friendship level." She plainly never tried to. We easily reach this conclusion, as her counsel must have, by reading only a few of the sexually teasing lines that her counsel withheld from Gagliardi's appellate presentation, such as, "I do wish you would have grabbed me by the arm—so gently of course because I dislike pain and because I was a bit tipsy and would have fallen to the ground and brought you with me and there we would have been tangled up together ... as the rumors started to flow ... that the famous product manager,

Mr. McNe[ill], has drank himself into a stup[o]r and made the new girl cry because he squeezed her arm really tight when she said no to his offer of enjoying a beautiful walk on the beach, and now she is sobbing on the ground with a bump on her head and her dress up above her waist exposing the fact that she forgot to bring appropriate under garments to wear with a dress, so she wore nothing at all." But in light of her counsel's obligation to be candid with the court, it is very difficult to conceive of the justification for the documentary omissions and the misleading factual representation that Gagliardi was a mere nonparticipant in someone else's unilateral and unwelcome romantic fantasy. *See* Minn. R. Prof. Conduct 3.1, 3.3 (prohibiting lawyers from asserting an issue with no basis in fact and requiring candor in all representations to a tribunal). The rules of civil appellate procedure require that "[t]he facts must be stated fairly [and] with complete candor." Minn. R. Civ.App. P. 128.02, subd. 1(c). As learned commentators have accurately advised, "a strained and inaccurate statement of the facts may irreparably impair a brief's credibility in the eyes of the appellate court." 3 Eric J. Magnuson & David F. Herr, *Minnesota Practice* § 128.6 (2006).

The district court concluded that Gagliardi failed to make a prima facie showing that Ortho–Midwest knew or should have known of this alleged harassment by McNeill. The district court was correct. Gagliardi never reported the McNeill emails to Carlander, and she reported them to Aircast only after her termination and after her boyfriend confronted McNeill and complained to Aircast's human-resources department about McNeill's emails. Ortho–Midwest is not liable under the Minnesota Human Rights Act for third-party conduct about which it was unaware. Ortho–Midwest is also not liable for the allegedly unwelcome emails be-cause they obviously were not unwelcome. Having reviewed the relevant documents excluded and not mentioned by Gagliardi, we conclude that Gagliardi's assertion to this court that McNeill unilaterally sought a personal relationship with Gagliardi is objectively false. No reasonable factfinder could find that McNeill's communication to Gagliardi was unwelcome in the face of the romantic seduction and sexual innuendo in her lengthy telephone messages and electronic letters to McNeill.

Ortho–Midwest is entitled to summary judgment with respect to the three incidents of alleged sexual harassment by Aircast employees. We reach a different result concerning Gagliardi's claim that Ortho–Midwest's owner, Carlander, sexually harassed her.

### Carlander's Alleged Sexual Harassment

■■■■ The evidence of Carlander's interaction with Gagliardi, when viewed in the light most favorable to her claims, establishes a prima facie case of sexual harassment by Ortho–Midwest. Although Gagliardi did not report her allegations about Carlander before he terminated her employment, "[i]n the unique circumstance in which the actual employer—rather than a co-worker or manager—engages in sexual harassment, we may infer that the employer had or, at the very least, should have had knowledge of the sexual harassment." *Munro Holding, LLC v. Cook*, 695 N.W.2d 379, 387 (Minn.App.2005). Gagliardi's claims as they regard Carlander survive summary judgment because her individual allegations, taken together, at least raise a question for a factfinder to decide whether Carlander created a hostile work environment.

Immediately after returning from the San Diego business trip, Gagliardi and Carlander traveled to Seattle together for three days of meetings. Gagliardi alleges

that Carlander began harassing her at the end of that trip. According to Gagliardi's deposition testimony, Carlander asked Gagliardi to check out of her hotel room and await their final preflight dinner in his hotel room. Gagliardi declined the invitation by saying that she would rather rest. But Carlander then checked out of his hotel room and brought his luggage to Gagliardi's room. After Gagliardi let him into the room, Carlander lay down on her bed, which was the only one in her room. Gagliardi testified that she left the room, but that Carlander then came looking for her. Later that evening, Carlander directed their limousine driver to take them around Seattle. Gagliardi claims that during that drive, Carlander sat very close to her and then laid his head in her lap, face up. Gagliardi claims that this made her very uncomfortable because she was in a dark, "very private place" with Carlander, and putting his head in her lap "was just not something that a boss should do."

Gagliardi testified that after returning from that business trip but before the next, she was present at Carlander's home office when he handed her a year-old calendar with sexually suggestive photographic images of his wife. Gagliardi presented evidence that several of the provocative photographs depicted Carlander's wife posed partially in the nude, and that Carlander flipped through the calendar, showing Gagliardi the images. She testified that Carlander then gave her the calendar but that after taking it to avoid offending him, she threw it away. She testified that she found that experience inappropriate and offensive.

Gagliardi claims also that Carlander's conduct during their third and final business trip together constituted another unwelcome romantic or sexual advance. According to Gagliardi, even though the two of them had reservations at separate ho-

tels, on their arrival Carlander directed their limousine to his hotel and asked the driver to remove both his and Gagliardi's luggage to be taken to his room. After both sets of luggage had been taken to Carlander's room, Gagliardi told Carlander that she wanted to stay at her own hotel instead. She claims that Carlander reacted as if he was offended by her refusal to lodge in his hotel room. Gagliardi testified that the next afternoon before dinner, she was with Carlander in his hotel room doing work on the computer. She alleges that while discussing leaving the room for dinner Carlander suggested that he put on a bathrobe, that the two of them remain in his hotel room and order room service, and that Gagliardi also change into a hotel bathrobe that he had already obtained for her. Gagliardi declined, and she ended the trip by returning early to Minnesota. She never returned to work.

Considered from Gagliardi's perspective, these facts tend to support the contention that almost immediately after Gagliardi joined Ortho–Midwest, the company's owner, to whom she reported directly, began interacting with her unprofessionally and sexually in the workplace or on work-related trips. These facts might suggest that he required her to join him frequently on business trips during which he attempted to manipulate circumstances for his own romantic or sexual interests. Through his conduct, as alleged, a factfinder might believe that Carlander pressured Gagliardi toward a physical or sexual relationship and that she considered his conduct to be unwelcome and offensive. During this same brief employment period he handed her sexually provocative photographs of his wife within an outdated, otherwise useless calendar. And without invitation he placed his head in her lap. This conduct allegedly impaired Gagliardi's ability to remain in the workplace and parallels allegations that courts have held sufficient to

establish a claim of sexual harassment. *See Beach v. Yellow Freight Sys.*, 312 F.3d 391, 397 (8th Cir.2002) (holding that graffiti that included sexually explicit drawings and phrases was of a graphic sexual nature demonstrating severe and pervasive harassment); *Moring v. Ark. Dep't of Corr.*, 243 F.3d 452, 456 (8th Cir.2001) (finding single incident in motel room that involved touching thigh and attempting kiss sufficient to create sexual-harassment question for jury); *Rorie v. United Parcel Serv., Inc.*, 151 F.3d 757, 762 (8th Cir.1998) (holding that supervisor's patting female employee on back, brushing up against her, and telling her she smelled nice could constitute sexual harassment); *Howard v. Burns Bros., Inc.*, 149 F.3d 835, 840 (8th Cir.1998) (holding that evidence of sexual innuendos and unwanted physical touching raised jury question of whether work environment was hostile); *Burns v. McGregor Electronic Indus., Inc.*, 989 F.2d 959, 964 (8th Cir.1993) (noting that sexual harassment need not consist of only explicit sexual advances, but can occur through sexual propositions, offensive touching, and sexual innuendo); *Jenson v. Eveleth Taconite Co.*, 824 F.Supp. 847, 879–80 (D.Minn.1993) (finding after bench trial that sexually explicit visual references of women in graffiti, photographs, and cartoons contributed to hostile work environment); *Munro Holding*, 695 N.W.2d at 387 (concluding that unwelcome, sexually motivated physical contact created an offensive, intimidating, and hostile work environment). We hold that these facts in the aggregate establish a prima facie case of sexual harassment creating a hostile work environment.

We recognize that Carlander and other witnesses offer a different perspective on Gagliardi's factual allegations. And Ortho–Midwest insists that the district court properly discounted the credibility of Gagliardi's allegations about Carlander by pointing to her emails and voice messages to McNeill encouraging and welcoming the conduct that Gagliardi later falsely claimed to be unwelcome and offensive. But weighing the evidence and determining credibility are not among the court's duties at summary judgment. A trier of fact is free to believe Gagliardi's claims about Carlander even if Ortho–Midwest presents a conflicting account and even if the factfinder is aware of her misleading accusations about McNeill.

The dissent maintains essentially that because Gagliardi "never indicated to Carlander at the time that his actions made her uncomfortable," we must conclude as a matter of law that she welcomed his conduct. As a practical matter, an employee does not carry the burden to affirmatively announce discomfort with objectively abnormal workplace conduct, such as a supervisor putting his head into her lap and presenting her with sexually provocative photographs of his wife. And the law is clear that whether Gagliardi *declared* discomfort to Carlander is not the test to determine whether she *welcomed* his conduct. Rather, "the threshold for determining that conduct is unwelcome is whether it was uninvited and offensive." *Burns*, 989 F.2d at 962 (quotation omitted). Generally, "[t]he question of whether particular conduct was unwelcome will turn largely on credibility determinations by the trier of fact." *Quick v. Donaldson Co.*, 90 F.3d 1372, 1378 (8th Cir.1996). Unlike Gagliardi's documented declarations expressly requesting McNeill's romantic attention, none of the cited emails to Carlander would resolve as a matter of law that she welcomed Carlander's conduct. The question of whether she invited Carlander's conduct requires resolution of disputed facts.

We also cannot agree with the dissent's view that Gagliardi presented no

evidence that Carlander's conduct made her uncomfortable or that the workplace was so offensive to allow a factfinder to conclude that it interfered with Gagliardi's job. A plaintiff may demonstrate through her conduct that harassment is unwelcome. *Beard v. Flying J, Inc.,* 266 F.3d 792, 798 (8th Cir.2001). Gagliardi claims that she threw away the allegedly offensive photographs of Carlander's wife soon after he gave her the calendar. On the four occasions that Carlander allegedly attempted to spend time with Gagliardi in one of their hotel rooms, Gagliardi's discomfort might be inferred from her response each time. She declined the first; she left Carlander behind in her own hotel room during the second; she expressly refused to stay the night in Carlander's hotel room in the third; and she declined his offer to change into a bathrobe and dine with him in his room during the fourth. She also alleges that her discomfort caused her to prematurely terminate their final business trip and return home without Carlander, never returning to the workplace. Although she admitted to an additional reason for her early return, the admission does not prevent a factfinder from crediting both reasons for leaving early. Gagliardi's version of the disputed facts implies unwelcomeness and job interference, which precludes summary judgment.

Carlander's allegedly harassing behavior during the truncated period of Gagliardi's employment, taken together, depicts a course of arguably sexual conduct that a factfinder may find to have created a hostile work environment. We therefore reverse the district court's summary judgment decision as to Carlander's conduct only.

## II

Gagliardi contends that the district court also erred by granting sum-

mary judgment on her retaliation claim. We disagree. The Minnesota Human Rights Act prohibits retaliation by an employer against an employee who has filed a complaint about an unfair, discriminatory practice. Minn.Stat. § 363A.15 (2006). A prima facie case of retaliation requires a showing that the complainant engaged in statutorily protected conduct, the employer took adverse action against the complainant, and a causal connection exists between the two. *Hoover v. Norwest Private Mortgage Banking,* 632 N.W.2d 534, 548 (Minn.2001). Although causation is generally a question of fact for the factfinder, *Paidar v. Hughes,* 615 N.W.2d 276, 281 (Minn.2000), summary judgment is appropriate when a plaintiff cannot prove an essential element of her claim, *Lubbers v. Anderson,* 539 N.W.2d 398, 401 (Minn. 1995).

Gagliardi argues that Ortho–Midwest retaliated by terminating her employment shortly after her boyfriend complained to Aircast about the alleged incidents of sexual harassment by Aircast's employees. The district court concluded that Gagliardi failed to establish a prima facie case because her boyfriend is not an employee and because he reported to Aircast, not to Gagliardi's employer. We agree with the district court's reasoning. The plain language of the Minnesota Human Rights Act defeats Gagliardi's argument. The Act makes it unlawful for an employer "to intentionally engage in any reprisal against any person because *that* person" engaged in protected conduct. Minn.Stat. § 363A.15 (emphasis added). Gagliardi was not "that person" in this case.

Gagliardi cites several federal cases to support her assertion that an employer may not retaliate against an employee because of the protected activity of a family member or friend. But we find Gagliardi's support to be unpersuasive. Of all the

cases she cites, only one, *De Medina v. Reinhardt*, 444 F.Supp. 573, 580 (D.D.C. 1978), appears to support Gagliardi's expansive reading of Title VII that retaliation claims may be based on the protected activity of a nonemployee family member or friend. Both the Third and Fifth Circuit Courts of Appeals have disagreed with its holding, and various other federal courts have declined to follow it. *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 568–69 (3rd Cir.2002); *Holt v. JTM Indus., Inc.*, 89 F.3d 1224, 1226 (5th Cir. 1996). The Eighth Circuit has expressly considered and rejected the proposition that Title VII's anti-retaliation provision prohibits employers from taking adverse employment action against employees whose spouses or acquaintances engaged in the allegedly statutorily protected activity. *See Smith v. Riceland Foods, Inc.*, 151 F.3d 813, 819 (8th Cir.1998) (holding that plaintiff bringing Title VII retaliation claim must establish that she personally engaged in protected conduct). The other cases cited by Gagliardi involved protected conduct by family members who were either current or former employees.

■ We hold that an employee must personally engage in protected conduct to establish a prima facie case of retaliation under the Minnesota Human Rights Act. Because Gagliardi cannot base her claim on her boyfriend's report to Aircast, she has failed to establish every element of a reprisal claim. We therefore do not reach Gagliardi's challenge to the district court's decision that Ortho–Midwest presented legitimate reasons for her discharge. The district court properly granted summary judgment in favor of Ortho–Midwest on Gagliardi's unsupported reprisal claim.

## DECISION

Gagliardi failed to establish prima facie cases of sexual harassment by Aircast employees and retaliation by Ortho–Midwest. We affirm the district court's summary judgment on these grounds. But we reverse summary judgment on Gagliardi's sexual-harassment claim against Carlander because resolution of the claim depends on factual determinations and, viewing the facts in the light most favorable to Gagliardi, she presented a prima facie case of sexual harassment.

**Affirmed in part, reversed in part.**

KALITOWSKI, Judge (concurring in part, dissenting in part).

I concur that the district court did not err in dismissing appellant's claim of sexual harassment arising from the alleged conduct of Aircast employees and her claim of reprisal discrimination. But because the district court correctly determined that appellant failed to produce any evidence that the alleged actions taken by Carlander were unwelcome and offensive to her or that Carlander's actions interfered with her employment or created a hostile work environment, I respectfully dissent.

An employee alleging sexual harassment must prove that the conduct in question is unwelcome and that the conduct has the purpose or effect of "substantially interfering with an individual's employment" or "creating an intimidating, hostile, or offensive employment." Minn.Stat. § 363A.03, subd. 43(3) (2006).

### I.

The district court correctly determined that appellant failed to raise a material issue of fact concerning whether Carlander's conduct was unwelcome. With regard to each of the specific incidents of alleged sexual harassment by Carlander the record supports the district court's finding that appellant never indicated to Carlander at the time that his actions

made her uncomfortable. And it is undisputed that on the sole occasion that appellant told anyone about any alleged incident of sexual harassment, appellant mentioned the offensive comment of the Aircast sales representative to Carlander and Carlander reported the matter to the Vice President of Human Resources for Aircast the next day.

In addition, as with her sexual harassment claims against McNeill, appellant's after the fact complaints concerning the unwelcome nature of Carlander's conduct are belied by evidence in the record including the e-mail messages she sent to him. Shortly after the business trip during which appellant alleges that she was sexually harassed when Carlander watched a movie on her hotel room bed and put his head in her lap while riding in a limo, appellant sent Carlander an e-mail stating:

> Hope your trip to Wisconsin went well and I will see you in the morning—I anticipate a call from you to set up a time and place.
>
> I can't believe I had to eat cereal for dinner last night! And where was my driver today? ?
>
> I actually had to put gas in my car myself!
>
> :) See you soon . . . . . . . . . Lisa

Similarly, during their final business trip together, appellant told Carlander her son was ill and she needed to fly home early. Appellant, who now claims she left early in part because she was sexually harassed by Carlander's comments regarding hotel bathrobes, sent the following e-mail to Carlander the night she arrived home:

> Hi Craig,
>
> Just wanted to update you—but still don't know the dx. Flight went fine. I'm exhausted. Thx for first class!! You're the best. Tell Dr. Nagle hi if you see him. Talk soon.

> Sorry again—I'm missing a great meeting and more great meals I'm sure. Take it easy.
>
> Lisa

On this record the district court was correct when it stated: "The Court has seen no evidence in the record that Mr. Carlander made Ms. Gagliardi uncomfortable, nor has it seen evidence that any of his conduct towards Ms. Gagliardi was unwelcome."

## II.

The district court should consider the totality of the circumstances in ascertaining whether an environment is sufficiently hostile or abusive to support a claim. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998). In making this determination a court is to consider the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Id.* at 787–88, 118 S.Ct. at 2283.

Here, the district court correctly determined that appellant "has completely failed to produce any evidence that actions taken by Mr. Carlander interfered with her employment or created a hostile work environment." Appellant has made no allegations that Carlander's conduct in any way prevented appellant from performing her job duties. Nor, as the district court found, has appellant "indicated she ever felt threatened by Mr. Carlander or humiliated by him."

The district court followed the law and considered the totality of the circumstances, including: (1) appellant's e-mail messages to McNeill and Carlander; (2) the undisputed fact that appellant maintained a friendly working relationship with Carlander; and (3) the fact that prior to the termination of her employment appel-

lant neither objected to Mr. Carlander's alleged conduct or indicated to anyone that his alleged conduct made her uncomfortable. The district court correctly concluded that appellant has failed to raise a material issue of fact as to whether Carlander's conduct substantially interfered with appellant's employment or created an intimidating, hostile, or offensive employment environment.

I would affirm the district court in all respects.