Trisha GEIST–MILLER, Appellant,

v.

Ronald MITCHELL, et
al., Respondents.

No. A09–1501.

Court of Appeals of Minnesota.

June 1, 2010.

Robert D. Boedigheimer, St. Paul, MN, for appellant.

James R. Andreen, Minneapolis, MN, for respondents.

Considered and decided by SHUMAKER, Presiding Judge; KLAPHAKE, Judge; and CRIPPEN, Judge.

## OPINION

CRIPPEN, Judge.*

In this appeal after remand, appellant Trisha Geist–Miller challenges the district court's summary judgment dismissing her hostile-work-environment claim against respondents. Because appellant has not presented sufficient evidence to create a genuine issue of material fact on the fourth element of her claim, that the alleged harassment affected a term, condition, or privilege of her employment, we affirm.

## FACTS

Between December 1994 and December 2003, appellant worked for two separate companies owned by respondent Ronald Mitchell and his wife, Sandra Mitchell: respondent Sun Place Tanning Studios, Inc., owned and operated tanning salons in the Rochester area; and Sun Place, Inc., owned and operated tanning salons in the Twin Cities area.

Appellant began her employment as a shift manager at one of the Rochester salons. After three or four years, she took on training responsibilities in addition to her shift-manager role. She was later pro-

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

moted to operations manager and then general manager. As general manager, appellant's responsibilities encompassed all stores owned by both entities.

In July 2003, following the birth of her son, appellant elected to scale back her duties. From that time until her separation from employment, she served as general manager for the Rochester-based Sun Place Tanning Studios, Inc., and as salon manager for one of the Rochester locations. Another employee accepted a position as general manager for Sun Place, Inc., and the Twin Cities salons. Also in 2003, the Mitchells were divorcing.

Most of the sexual harassment alleged by appellant also took place in 2003. Through contemporaneous incident reports and deposition testimony, appellant identified the following incidents of alleged harassment:

On February 26, 2003, Ronald Mitchell, upset because he believed that his wife was "running around" on him, changed the locks to the Rochester business office, provided appellant with a key, and asked her if she would protect him. Appellant replied that she would, but that she would protect Sandra Mitchell as well.

On August 26, 2003, during a drive home after drinks with business associates, Ronald Mitchell told appellant that she was "denying him" by not running away with him and that if her husband ever messed up, Ronald Mitchell would come and get her. Ronald Mitchell told her that he had bought a Lincoln Navigator so that her son and their future children could watch DVDs while they travelled.

On September 17, 2003, Ronald Mitchell told appellant about a dream in which he had divorced his wife; and he and appellant had wed, had a baby girl, and opened five new salons.

In October 2003, Ronald Mitchell put his arm around appellant and said, "My one true love, will you run away with me?" and, when she declined, he told her she had "no guts."

On October 14, 2003, a business associate asked appellant and Mitchell whether they had slept together. Appellant replied "God, no," but the conversation devolved into sexual innuendo. The next day, Ronald Mitchell put his arm around appellant and said, "Seeing that we had sex, maybe we should run away and continue having sex." Appellant replied that they had not had sex and would not.

On October 20, 2003, Ronald and Sandra Mitchell were both present at a Rochester salon and upset with each other. Ronald Mitchell walked behind appellant and brushed up against her buttocks. Later, he put his arm around her and told her that he was going to get control of the business and that everything would work out.

Sometime in 2003, during a meeting with outside business associates, Ronald Mitchell began comparing women's breasts, and told appellant that hers were "so-so."

On an unidentified date, in the presence of other employees, Ronald Mitchell said that he did not care if appellant was in the back "pleasuring herself," as long as she was getting her vacuuming done. While smoking cigarettes with several employees, Ronald Mitchell told one of the employees that she should not wear a certain shirt because it made her nipples show.

Ronald Mitchell said that he "could be out to lunch with two hairdressers one minute and the next minute be in bed with them."

On her deposition correction sheet, appellant identified several additional inci-

dents of harassment, including, for the first time, incidents of unwanted touching:

Sometime in 1996 or 1997, Ronald Mitchell entered a room where appellant was cleaning a tanning bed, grabbed her and kissed her. When she asked why he did that, he said he was having a good day.

On an unidentified date, appellant was putting on lip balm when Ronald Mitchell asked her to give him some. When appellant handed him the tube, Mitchell told her he wanted some of hers and grabbed the back of her neck in an attempt to touch his lips to hers. She backed away and said no; he told her she had "no guts."

On an unidentified date, while appellant drove him to an eye appointment in the Twin Cities, Ronald Mitchell put his hand on appellant's leg and suggested that they run away together. She said no, and he told her she had "no guts." Appellant also asserts that Mitchell would often rest his hand on her leg when they drove places together.

Finally, in handwritten notes attached to her affidavit, appellant asserts that Ronald Mitchell would touch her hair when she wore it down, and tell her that she should wear it that way more often.

Appellant testified that Mitchell's conduct made her "uncomfortable," "embarrassed," and "upset." She could not recall whether she had ever shared her written incident reports or otherwise reported Ronald Mitchell's conduct to anyone. Appellant believed that she had a few conversations with human resources employee Denys Rain about Ronald Mitchell asking her to run away with him. She also testified that sometime in 2007 she told Sandra Mitchell about Ronald Mitchell asking her to run away with him and her discomfort about being alone with him. She could not remember at her deposition whether she told anyone else. In her deposition correction sheet, appellant stated that she remembered talking to another HR employee about feeling uncomfortable riding in the car alone with Ronald Mitchell.

Ronald Mitchell denied each of the alleged incidents of harassment, except that he admitted that a business colleague had asked if he and appellant were having sex and to making a comment about the two hairdressers. He also conceded that he may have put his arm around appellant and told her that everything would be okay with the business. Ronald Mitchell denied ever having seen appellant's written incident reports before his deposition. Sandra Mitchell testified that appellant never complained about Ronald Mitchell's behavior toward her until after her termination. Rain testified that the only incident that appellant ever disclosed to her was a report stating that in October or November 2003, Ronald Mitchell engaged in inappropriate conduct, but the conduct did not involve sexual harassment. Rain did not pursue this because it happened outside of work.

On December 17, 2003, the district court in the Mitchells' divorce proceedings entered a temporary order making Ronald Mitchell responsible for the day-to-day management of Sun Place Tanning Studios, Inc., and the Rochester salons and Sandra Mitchell responsible for Sun Place, Inc., and the Twin Cities salons. Each of the Mitchells was prohibited from entering the business premises assigned to the other.

In anticipation of the court's written order, Ronald Mitchell issued a memorandum to managers of Sun Place Tanning Studios, advising them of the terms of the court's order. The memo also required the managers' written acknowledgments that they should make no attempt to contact Sandra Mitchell, and should advise

Ronald Mitchell if Sandra Mitchell attempted to contact them. Three managers signed the acknowledgment; appellant and another employee refused, and both were discharged from employment.

Appellant brought suit against respondents, asserting claims for sexual harassment and reprisal. Respondents moved for summary judgment, which the district court granted, dismissing appellant's sexual harassment claims based on a determination that appellant could not demonstrate the fifth element of a sexual harassment claim: that the employer knew or should have known of the harassment and failed to take appropriate remedial action. *Geist–Miller v. Mitchell*, No. A07–1859, 2008 WL 3898207, at *3 (Minn. App. Aug.26, 2008). This court subsequently reversed the summary judgment in part, concluding that the district court's basis for dismissal was "no longer viable" because the Minnesota Supreme Court had held in *Frieler v. Carlson Mktg. Group*, 751 N.W.2d 558, 567 (Minn.2008), following 2001 amendments to the Minnesota Human Rights Act, that the fifth element of a sexual harassment claim was no longer required. *Geist–Miller*, 2008 WL 3898207 at *2–3. Observing that the district court's decision was "based solely on her failure to meet an element no longer required," this court reversed the portion of the order dismissing the sexual harassment claims and remanded for further consideration in accordance with *Frieler*. *Id.* at *3.

Following remand, the district court again dismissed the complaint, determining as a matter of law that the harassment alleged by appellant was not sufficiently severe and pervasive to alter a condition of her employment, and, alternatively, that respondents met the elements of the affirmative defense adopted by the supreme court in *Frieler*.

## ISSUE

Did the district court err by granting summary judgment dismissing the hostile work environment claim?

## ANALYSIS

### I.

■ This court reviews de novo the grant of summary judgment. *Gagliardi v. Ortho–Midwest, Inc.*, 733 N.W.2d 171, 175 (Minn.App.2007). Summary judgment is appropriately granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03.

■ This review prompts our careful attention to summary judgment standards. "The district court's function on a motion for summary judgment is not to decide issues of fact, but solely to determine whether genuine factual issues exist." *DLH, Inc. v. Russ*, 566 N.W.2d 60, 70 (Minn.1997). Accordingly, a court deciding a summary-judgment motion must not make factual findings or credibility determinations or otherwise weigh evidence relevant to disputed facts. *Id.; see also Hoyt Props., Inc. v. Prod. Res. Group, L.L.C.*, 736 N.W.2d 313, 320 (Minn.2007) ("Weighing the evidence and assessing credibility on summary judgment is error.").

Stated differently, a defendant is not entitled to summary judgment when the plaintiff's evidence, if fully believed, would support a claim for relief. *See Hoyt*, 736 N.W.2d at 320 (reversing summary judgment dismissing fraud claim because "the only way for the district court to have concluded that the representations were not knowingly false was to have weighed

the evidence and assessed the credibility of the parties"). Under this standard, the question is not addressed in terms of what is established or demonstrated; rather, the motion for summary judgment is defeated if evidence is pointed out or identified that, if fully believed, would support a claim.

■ Still, "[a] defendant is entitled to summary judgment as a matter of law when the record reflects a complete lack of proof on an essential element of the plaintiff's claim." *Lubbers v. Anderson,* 539 N.W.2d 398, 401 (Minn.1995). Moreover, "when determining whether a genuine issue of material fact for trial exists, the court is not required to ignore its conclusion that a particular piece of evidence may have no probative value, such that reasonable persons could not draw different conclusions from the evidence presented." *DLH,* 566 N.W.2d at 70.

The district court's memorandum in this case contains language that signals inappropriate fact-finding. Its employment-effects decision, analyzed below, is stated in terms of what appellant demonstrated or established. In its earlier analysis of other hostile-work-environment elements, the memorandum states a group of observations begun with the statement of what the court "finds" based on appellant's allegations. And on respondent's affirmative defense, the court granted summary judgment based on a finding that respondent "met its' burden of establishing the elements ... by a preponderance of the evidence."

■ Appellant is not required to demonstrate or prove her claim in order to avoid summary judgment; she must furnish evidence creating genuinely disputed material facts. The district court's evident error may lie in its language and not in employment of an improper standard, but the language invites dispute and encumbers review. In any event, on this record, independently reviewed, the district court's summary judgment was proper. We observe the court's memorandum in another effort to encourage precision in language that insures adherence to the established standard. Summary judgment, undeniably a "blunt instrument," is limited to those cases warranting its application. *See Osborne v. Twin Town Bowl, Inc.,* 749 N.W.2d 367, 371 (Minn.2008) (describing summary judgment as "blunt instrument").

## II.

■ To prevail on a sexual harassment claim under a hostile-work-environment theory, a plaintiff must show that "(1) she is a member of a protected class; (2) she was subject to unwelcome harassment; (3) the harassment was based on [sex]; [and] (4) the harassment affected a term, condition, or privilege of her employment." *Frieler,* 751 N.W.2d at 571 n. 11. At issue here is whether appellant has presented evidence sufficient to meet the fourth element of her claim.[1]

■ In order to demonstrate that the harassment affected a term, condition, or privilege of employment, a plaintiff will have to show the harassment was "so severe or pervasive as to alter the conditions of the [plaintiff's] employment and create

---

1. Appellant also challenges the district court's determination that some of the conduct alleged by her was not unwelcome and/or not based on sex. She acknowledges that it is "unclear whether the court definitively concludes that [she] failed to meet the second element," and asserts that the district court "failed to take into consideration the entire course of ... conduct" in analyzing the fourth element. Despite its preliminary findings, it is evident that the district court did not find the claim lacking on elements other than the fourth, nor do we in our independent review.

an abusive working environment." *Goins v. West Group,* 635 N.W.2d 717, 725 (Minn. 2001) (alteration in original) (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)) (quotation marks and other quotation omitted). Relying on U.S. Supreme Court precedents, the Minnesota Supreme Court has explained that

> [t]he objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so. In ascertaining whether an environment is sufficiently hostile or abusive to support a claim, courts look at the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Goins,* 635 N.W.2d at 725 (quotations and citation omitted). "To clear the high threshold of actionable harm, [the plaintiff] has to show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult.'" *Duncan v. General Motors Corp.,* 300 F.3d 928, 934 (8th Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993)).

■ Respondents assert that the three additional incidents alleged by appellant on her deposition correction sheet cannot properly be used to oppose summary judgment. It is settled that a party may not avoid summary judgment through a self-serving affidavit that contradicts deposition testimony, although affidavits may be used to clarify deposition testimony when it is clear that the deponent was confused. *Banbury v. Omnitrition Int'l, Inc.,* 533 N.W.2d 876, 881 (Minn.App.1995). But no

bright-line rule has emerged governing a plaintiff's additional recall following a deposition. *Compare Durant v. A.C.S. State & Local Solutions, Inc.,* 460 F.Supp.2d 492, 494–95 (S.D.N.Y.2006) (refusing to consider additional incidents of harassment because plaintiff answered "no" to question about whether she based her claim on any additional harassment) *with Burton v. Dofasco Tubular Prods.,* No. 1:06 CV 2466, 2007 WL 2624342, at *8 (N.D.Ohio Sept.6, 2007) (considering such evidence "in an overabundance of caution"). We need not resolve this issue here because, even taking into account the additional allegations, appellant has failed to present evidence sufficient to create a genuine issue of material fact on the fourth element of her hostile-work-environment claim.

The majority of appellant's harassment allegations involve Ronald Mitchell's inappropriate sexual banter and unsuccessful pursuit of a relationship with her—types of conduct that lack the severity and level of interference required by *Goins,* 635 N.W.2d at 725–26, to create a hostile work environment. And, although the belated allegations that Ronald Mitchell attempted to kiss appellant, touched her hair, and placed his hand on her leg, are more serious, they do not rise to the level of severity creating a hostile work environment. *See, e.g., Alagna v. Smithville R–II Sch. Dist.,* 324 F.3d 975, 977–78, 980 (8th Cir. 2003) (holding that male teacher's inappropriate conduct over two-year period, which included touching, comments on appearance, saying "I love you," exhibiting demeanor of a sexual nature, calls at home, and giving gifts, was not sufficiently severe or pervasive to create hostile environment); *Duncan,* 300 F.3d at 931–32, 935 (holding insufficient to demonstrate hostile workplace conduct that included requesting a relationship with the plaintiff, touching the plaintiff's hand, asking the plaintiff to draw a picture of a cactus planter de-

picting a man with the cactus as his penis, and displaying posters identifying plaintiff as the president of the Man Hater's Club of America).

Appellant urges our reliance on *Gagliardi*. But that case rests an effect-on-employment determination on distinguishable allegations, that the plaintiff's supervisor, during a business trip, asked her to come to his hotel room before going to dinner and, when she declined, came to her room and lay down on her bed; sat very close to her and put his head in her lap during a limousine ride; gave her a calendar with sexually suggestive photographs of his wife; and, during another business trip, asked that her baggage be taken to his hotel room and suggested that they both change into bathrobes and order room service. 733 N.W.2d at 179–80. The court reasoned that, "[c]onsidered from Gagliardi's perspective, these facts tend to support the contention that almost immediately after Gagliardi joined Ortho–Midwest, the company's owner, to whom she reported directly, began interacting with her unprofessionally and sexually in the workplace or on work-related trips." *Id.* at 180.

The conduct alleged by appellant was "boorish, chauvinistic, and decidedly immature," *Duncan*, 300 F.3d at 935, but it was not physically threatening or intimidating; nor is there other evidence that it interfered with appellant's ability to perform her job. In contrast to *Gagliardi*, most of the incidents appellant identifies occurred during the last four months of her employment. Moreover, when Ronald Mitchell's advances were rebuffed, he took no more invasive action. None rose to the level of actually pursuing intimacy in an out-of-town hotel. In further contrast to *Gagliardi*, appellant continued her employment until it was terminated for a non-discriminatory reason. Under these cir-

cumstances, despite appellant's assertions that Ronald Mitchell's conduct made her "uncomfortable," "embarrassed," and "upset," the evidence is insufficient to create a genuine issue of material fact as to whether the harassment was sufficiently pervasive to be actionable.

The district court's summary judgment was also premised on an affirmative-defense of respondents. Because we affirm on the first stated ground, we have no occasion to further review this added holding.

### DECISION

Summary judgment was appropriately granted because appellant failed to present evidence sufficient to create a genuine issue of material fact with respect to the fourth element of her hostile-work-environment claim.

**Affirmed.**