Jaime RASMUSSEN, et al., Appellants,

v.

**TWO HARBORS FISH COMPANY**
d/b/a Lou's Fish House, et al.,
**Respondents.**

No. A11–2178.

Court of Appeals of Minnesota.

July 23, 2012.

Thomas F. Andrew, Jane C. Poole, Andrew & Bransky, P.A., Duluth, MN, for appellants.

Joseph J. Roby, Jr., Johnson, Killen & Seiler, P.A., Duluth, MN, for respondents.

Considered and decided by SCHELLHAS, Presiding Judge; KALITOWSKI, Judge; and CHUTICH, Judge.

## OPINION

CHUTICH, Judge.

In this appeal after a bench trial, appellants Jaime Rasmussen, Jennifer Moyer, and Kathe Reinhold challenge the dismissal of their hostile work environment claim against respondents Two Harbors Fish Co., BWZ Enterprises, and Brian Zapolski. Because the district court erred in concluding that Zapolski's conduct toward appellants was not sufficiently severe and pervasive to create a hostile, intimidating, or offensive work environment under the Minnesota Human Rights Act, we reverse and remand for further proceedings.

## FACTS

Respondent Brian Zapolski is the owner and sole shareholder of Two Harbors Fish Co., doing business as Lou's Fish House (Lou's) and BWZ Enterprises, LLC, doing business as B & R Motel. Lou's is a retail store in Two Harbors that makes and sells smoked fish and other related products, and B & R Motel is a small, connected motel. Appellants were employed by both Two Harbors Fish Co. and BWZ Enterprises, and supervised by Zapolski.

### Appellant Rasmussen

Jaime Rasmussen began working full-time at Lou's in September 2008, and she worked there until she quit in mid-March 2010. Rasmussen, who is married, was 32 years old when she began work at Lou's, and she has one child who was 13 years old at the time of trial. Her duties included selling fish and cleaning in the retail store, cleaning and renting the motel rooms, and making brine and splitting wood for the smoking operation. In 2009, she also began helping Zapolski with administrative tasks, such as payroll. Zapolski was very involved in the day-to-day operations of the businesses, and was often present when Rasmussen was working.

In early 2009, about six months after Rasmussen began working for Zapolski, he began to make sexual comments to her and to ask her questions of a sexual nature.[1] The district court found that Zapolski frequently asked Rasmussen about her sexual position preferences, described his favorite sexual positions, explicitly detailed sexual dreams that he had, and told her that he would wake up with an erection. He talked often, both in her presence and directly to her, about sex, and "how good it feels to orgasm," using explicit terms like "blow job," "pussy," "g-spot," "clitoris," and "getting off."

In July 2009, Zapolski showed nude photos in a *Playboy* magazine to Rasmussen and two other employees and told them that "the girl" in the photos looked like Rasmussen. He also brought a pornographic DVD entitled *Squirters 2* to work and suggested that Rasmussen and a male employee each take it home, watch it, and report their observations to Zapolski. The district court further found that Zapolski engaged in inappropriate physical contact with Rasmussen, including twice touching her buttocks with his hands, and once grabbing her arms to feel her muscles.

Zapolski also occasionally called Rasmussen his "girlfriend" when speaking with other employees, and often called her "honey," "beautiful," "sexy," and other similar terms. In addition, he often made coarse and inappropriate comments to Rasmussen about female customers, including comments about their breasts and posteriors, and often referred to females as "cunts."

In making these findings, the district court found that Rasmussen's testimony was "substantially credible." By contrast, the court did "not believe that Zapolski's testimony was truthful and therefore . . . generally disregarded his denials." Despite these findings on credibility, the district court sanitized some of Rasmussen's testimony and omitted other incidents described by her. We believe it appropriate to include these additional facts in our consideration because, in its analysis, the district court specifically accepted all of this asserted conduct, noting that "even if totally true," the facts did not rise to the level of unwelcome sexual harassment under the Minnesota Human Rights Act.[2]

Rasmussen testified that Zapolski told her that he often woke up with a "hard-on" and that he made love to his pillow because no one was next to him. In reference to customers, he often made comments such as, "Wow, look at the tits on that one," and, "Look at that nice ass," and if a nice-looking woman came into the store, he frequently asked Rasmussen if she thought that the customer "would go in a room with him and fuck."

Zapolski also told Rasmussen that another employee had given him a "blow job" for his birthday. Once, after a customer asked him about certain long, beef-jerky strips, Zapolski came to Rasmussen in the back of the store laughing, grabbed his pants zipper, and said "I'll show you something big and long." Regarding the physical touching, Rasmussen testified that Zapolski once grabbed her from behind and pushed his pelvis into her buttocks until she got beet red and yelled, "Get off me, get off me."

---

1. Because the Minnesota Human Rights Act prohibits sexual harassment that is severe and pervasive, and because cases of discrimination often turn on their specific facts, we set forth the facts in an explicit and unvarnished fashion.

2. We also note, however, that even without these additional facts, Zapolski's conduct violated the act.

S.P., a male who worked summers at Lou's during this time period, confirmed much of Rasmussen's key testimony. The district court specifically found that S.P. was "generally a credible witness." S.P. testified that, more than once, he saw Zapolski touch Rasmussen's posterior with his hands. He also confirmed that Zapolski showed him a nude photo in *Playboy* magazine, and asked if "the girl in the photo didn't look like Jaime Rasmussen." S.P. testified that he heard Zapolski talk about his favorite sexual positions and his sexual dreams, comment on customers' appearance, use the word "cunt" in reference to females at work, and call Rasmussen names like "honey," "beautiful," "sweetie," and "sexy."

Zapolski's conduct caused Rasmussen to feel embarrassed, ashamed, and uncomfortable. She told him that his comments and actions were inappropriate, he should stop touching her, and that she did not want to hear his explicit comments because they were "gross." She told him, in response to the nude *Playboy* centerfold, that his comparison was "disgusting" and that she did not "need to hear that." While she dressed nicely when she first started working at Lou's, Rasmussen began to wear baggy clothes and did not fix her hair because she was "grossed out" by the way Zapolski looked at her and talked to her.

Rasmussen quit working for Zapolski on March 15, 2010, after her husband, who had been laid off from his job since January 2009, was called back to work. She testified that she did not quit earlier because she "didn't have a choice"; her husband was laid off, they had a child and needed the money, and nobody else in town was hiring.

## Appellant Moyer

Jennifer Moyer was 21 years old when she began working part-time, mostly weekends and evenings, at Lou's in May 2009. She provided the sole support for her one-year-old daughter at the time and was also working two other part-time jobs in Two Harbors. Moyer waited on customers, stocked the retail area, cleaned the inside of the store, and cleaned and did laundry for the motel.

The district court found that Zapolski began making sexual comments to Moyer within two weeks after she started working at Lou's. He asked her how her sex life was and told her that a girl of her age should be having "lots of sex." He twice bragged to her about his sexual prowess with other women. Zapolski made sexual comments to her about other people, and the district court found that Zapolski "created a negative work environment for Moyer by showing her nude photos in a *Playboy* magazine and asking her if the person in the nude pictures looked like Rasmussen, a co-worker." The district court further found that "Zapolski's attempt to have Moyer solicit other young women to have sex with him created a hostile work environment." About a month after Moyer began to work for Zapolski, "for approximately a week, Zapolski asked her to hook him up with her friends . . . or with her sister."

During a trip to Duluth to buy supplies, Zapolski said to Moyer, "You know what people are thinking don't you; they think we're a couple." Regarding physical touching, the district court found that Zapolski "may have patted [Moyer's] posterior once" and grabbed her waist on another occasion.

Again, while finding Moyer's testimony "moderately credible" and Zapolski's denials not credible,[3] the district court sani-

---

**3.** The district court specifically found that Za-

polski's testimony that Moyer, "a 21–year–old

tized or omitted the more explicit portions of her testimony. It did so even though it accepted the allegations as "totally true" for purposes of analyzing whether Zapolski's conduct violated the Minnesota Human Rights Act. Moyer testified that Zapolski talked about how many times he made women orgasm in one setting, and often commented about female customers, such as "look at the tits on that one" or "look at the ass on that one." Zapolski pestered her for about a week about "hooking him up" with her friends or her sister, and said that "he would even be willing to pay for it," which Moyer understood to mean he would pay for sex. Zapolski asked her if her boyfriend was good at sex, called her at work and asked, "How's my little horny one?" and attempted to portray Moyer as his girlfriend. On one occasion, after a woman dropped off a job application to work at Lou's, Zapolski asked Moyer if she thought the woman would "give him a blow job" if he hired her.

Zapolski's conduct made Moyer feel uncomfortable, and, like Rasmussen, she started wearing loose-fitting, baggy clothes in an attempt to "grunge" herself down. She tried to discourage his behavior by giving him a look of disgust, walking away from him, or ignoring his comments. When he asked her to hook him up with her friends, she tried to laugh it off like he was joking. Moyer testified that she was not more assertive in rebuffing his comments and actions because she was scared that she would lose her job.

On August 24, 2009, Zapolski criticized her for using her cell phone while at work. Moyer was upset and told her mother about the cell phone incident, and about Zapolski's inappropriate conduct over the

past four months. Moyer's mother and stepfather essentially told her that she could not work at Lou's anymore, "dragged [her] out of there," and brought her immediately to the police station to make a complaint.

### Appellant Reinhold

Kathe Reinhold began working at Lou's Fish House on October 31, 2009, and worked only six shifts before she quit because of Zapolski's harassing conduct. She was 47 years old at the time and had a 17–year–old son. Reinhold was hired by Zapolski to smoke fish, stack wood, and work in the retail store on weekends. She also cleaned and did laundry in the motel.

The district court found that Zapolski began making sexual comments to Reinhold on the first day that she worked at Lou's, telling her "[y]ou don't need to be in a relationship or be in love to have sex all night." She found this comment inappropriate and told him that she was Swedish and modest. On her second day of work, Zapolski talked about orgasms, and told Reinhold that "everybody should be able to have an orgasm as it is the best feeling in the world." Zapolski talked about sex on a daily basis, including explicit discussion about the size of men's genitals. He insisted that Reinhold's son was having sex with his girlfriend, and told Reinhold that she should give him condoms. The district court specifically found that this sexual talk "created an uncomfortable work environment for Reinhold."

During the six days that she worked for him, Zapolski also made unwelcome physical contact with Reinhold. On one occasion, he grabbed her by the shoulders and squeezed. He also took Reinhold by the hand and led her to the next task, which

single mother said to him, 'I am very unhappy because my boyfriend has a little prick and

can't take care of me' " was not believable.

she believed was an attempt to control her. She told him that she did not enjoy that physical contact. On her last day of work, Zapolski attempted to pick wood shavings from her chest after she had been chopping wood.

The district court further found that "Zapolski's advances toward Reinhold created a negative work environment for her," and detailed the following advances. On Reinhold's first and second days of work, Zapolski asked her out to dinner, but backed off when she told him she wanted to bring her sister and they would pay separately. He once called her on the phone and asked her if she would kiss him when he came to work. He called her "sweetie" and persisted in doing so, even after she told him that she did not like being called that name. One day when not on duty, Reinhold ran into Zapolski at a store and he told her that it was "a perfect day to watch a football game on television and make love," which she took as an invitation. She said that she felt "violated because he was her employer."

As with the testimony of Rasmussen and Moyer, the district court omitted the more egregious portions of Reinhold's testimony, while finding her to be "substantially credible." It again accepted her allegations as "totally true" for purposes of its sexual-harassment determination. Reinhold testified that Zapolski asked her if she "liked to get excited" and "liked to have sex." He made a comment to Reinhold about how many "inches" most women like and told her, "I think six inches would be just perfect for you." He also told her a story about a couple in town who wanted to do nothing but "screw" and "[a]nytime that you would drive by their car, her legs would be up in the air." Zapolski told her of one occasion where the woman, who was mentally retarded, was in the car with a dog and "the dog was licking her pussy."

Reinhold testified that Zapolski's conduct made her feel anxious, intimidated, embarrassed, and uncomfortable. The record shows that she tried to rebuff his behavior. After he told her the dog story, she said, "This is a very strange place" and walked straight out the door. After only six shifts, Reinhold quit her employment and wrote Zapolski a letter telling him that she quit because of his sexually-harassing behavior. She was so upset by his treatment of her that she went to the Two Harbors Police Station, but was told that the police could take no action.

### Procedural History

Rasmussen, Moyer, and Reinhold sued Zapolski on March 18, 2010, in Lake County District Court, and later added the corporate entities as defendants, claiming that Zapolski sexually harassed them in violation of the Minnesota Human Rights Act (the act). The district court permitted appellants to amend their complaint to add a claim for punitive damages.

After a court trial, the district court issued an order dismissing appellants' claims, finding that the conduct, "even if totally true," does not rise to the "level of unwelcome sexual harassment actionable under the Minnesota Human Rights Act." After the three women moved to amend the findings, the district court issued an amended order, but did not change its conclusion that the women failed to prove sexual harassment. This appeal followed.

### ISSUES

I. What is the applicable standard of review on appeal of judgment entered after a bench trial on a claim of sexual harassment under the Minnesota Human Rights Act?

II. Did the district court err in concluding that appellants failed to

prove their sexual harassment claims?

III. Can respondent Brian Zapolski be held individually liable for aiding and abetting discrimination under Minn.Stat. § 363A.14?

## ANALYSIS

### I. Standard of Review

■ After a bench trial, we give the district court's findings great deference and will reverse "only if the result is clearly erroneous." *Giuliani v. Stuart Corp.,* 512 N.W.2d 589, 593 (Minn.App.1994). "This deference is especially strong in employment discrimination cases. Under the clearly erroneous standard, the findings of the trial court will not be disturbed if they are reasonably supported by evidence in the record considered as a whole." *Id.* (citations and quotations omitted); *see also Johnson v. Ramsey Cnty.,* 424 N.W.2d 800, 804 (Minn.App.1988) ("A trial court's findings are clearly erroneous if they are without substantial evidentiary support or are induced by an erroneous view of the law."), *review denied* (Minn. Aug. 24, 1988). Questions of law are reviewed de novo. *Fore v. Health Dimensions, Inc.,* 509 N.W.2d 557, 559 (Minn.App.1993).

The parties agree that we review the district court's findings on the underlying facts, i.e., the incidents of Zapolski's inappropriate conduct, for clear error. *See* Minn. R. Civ. P. 52.01 ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."). Notably, respondents do not attack the district court's underlying factual findings about the conduct that occurred.

Respondents do contend, however, that the district court's conclusion that Zapolski's conduct is not actionable sexual harassment is also a finding of fact that we should review under a clearly erroneous standard. Appellants, on the other hand, assert that this ultimate determination is a conclusion of law, which we should review de novo.

Neither the supreme court nor this court has explicitly addressed this question in the past, but this court has, without discussion, reviewed a trial court's conclusion concerning whether sexual harassment occurred as a finding of fact, applying the deferential clear-error standard. *See, e.g., Giuliani,* 512 N.W.2d at 593 ("The trial court's finding that [the plaintiff] was sexually harassed was not clearly erroneous."); *Fore,* 509 N.W.2d at 560 ("Here, the district court found that the acts ... did not constitute sexual harassment. These findings are not clearly erroneous."); *Bougie v. Sibley Manor, Inc.,* 504 N.W.2d 493, 499 (Minn.App.1993) (same); *Bersie v. Zycad Corp.,* 417 N.W.2d 288, 290 (Minn.App.1987) (same), *review denied* (Minn. May 5, 1988).

In applying this more deferential standard, the court may have been following the lead of federal cases applying Title VII in sexual harassment cases. *See, e.g., Hall v. Gus Constr. Co.,* 842 F.2d 1010, 1013 (8th Cir.1988) (stating that after a bench trial, "[w]e must assess the trial court's factual finding that the women were subjected to sexual harassment under the clearly erroneous standard of review"). But, as the Minnesota Supreme Court observed in *Cummings v. Koehnen,* courts in Minnesota are not necessarily required to follow federal cases interpreting Title VII "because the [Minnesota Human Right Act] is not similar to Title VII in its treatment of sexual harassment.... Title VII's statutory prohibition turns on discrimination, while Minnesota's statutory language includes the specific definition of sexual

harassment."[4] 568 N.W.2d 418, 422 n. 5 (Minn.1997).

■ We believe that the ultimate determination of sexual harassment is a legal conclusion rather than a finding of fact. The district court is applying its factual findings (what happened to the plaintiffs) to a statutory definition (whether those incidents amount to "sexual harassment"). Moreover, the legislature has provided a clear definition of "sexual harassment" that an appellate court can apply without having to make any credibility determinations; we can accept the district court's findings on the underlying conduct, and if they are not clearly erroneous, apply the statutory definition to determine whether appellants have proved their claim.[5]

We need not make a definitive determination on the standard of review in this case, however, because our decision would be the same under either standard. Given this court's previous decisions analyzing the ultimate determination of sexual harassment under a clearly erroneous standard, and because the issue is not determinative here, we review the district court's determination that appellants did not prove their sexual harassment claims for clear error.

## II. Sexual Harassment Claims

### A. *Standard for Sexual Harassment*

Under the Minnesota Human Rights Act, an unfair employment practice occurs when an employer, because of a person's sex, discriminates against that person "with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment." Minn. Stat. § 363A.08, subd. 2(3) (2010). Discrimination is defined to include sexual harassment that creates a hostile work environment. Minn.Stat. § 363A.03, subds. 13, 43 (2010).

The district court applied a four-factor framework, originally derived from federal cases applying Title VII law, to determine whether the women proved their claims of a hostile work environment under the human rights act. *See Goins v. W. Group*, 635 N.W.2d 717, 725 (Minn.2001) (citing *Carter v. Chrysler Corp.*, 173 F.3d 693, 700 (8th Cir.1999)). It required each to prove that "(1) she is a member of a protected class; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex, and (4) the harassment affected a term, condition or privilege of her employment." *Rasmussen v. Two Harbors Fish Co.*, No. 38–CV–10–201, slip op. (Minn. Dist.Ct. Oct. 5, 2011) (citing *Frieler v. Carlson Mktg. Grp., Inc.*, 751 N.W.2d 558, 571 n. 11 (Minn.2008)).

■ Because the district court accepted, for analytical purposes, all of the employees' allegations as "totally true," respondents do not dispute that all but one of the

---

4. Sexual harassment cases under Title VII are also typically tried by a jury, another difference from Minnesota law. *See* Minn.Stat. § 363A.33, subd. 6 (2010).

5. In addition, this approach is consistent with unemployment compensation cases addressing whether an employer sexually harassed an employee and thus caused the employee to have good reason to quit. In these cases, "[w]hether one engaged in the actions underlying the sexual harassment claim is a question of fact. But whether such actions constitute sexual harassment under the statute is a

question of law." *Munro Holding, LLC v. Cook*, 695 N.W.2d 379, 385 (Minn.App.2005). Because the definition of "sexual harassment" in the Minnesota Human Rights Act and in the unemployment statute are similar, *compare* Minn.Stat. § 363A.03, subd. 43 (2010), *with* Minn.Stat. § 268.095, subd. 3(f) (2010), a persuasive argument can be made that these claims should be interpreted under the same standard of review, even though the purposes of the two statutes are certainly different.

elements stated above have been met by each of the women. The record shows that the district court's finding that factors one through three were met is well supported.[6]

Thus, the only issue on appeal is whether the sexual harassment affected a term, condition or privilege of the women's employment, the fourth factor.[7] To determine whether this factor is met, we turn to the specific definition of sexual harassment in the Minnesota Human Rights Act:

> "Sexual harassment" includes unwelcome sexual advances, requests for sexual favors, sexually motivated physical contact or other verbal or physical conduct or communication of a sexual nature when:
>
> (1) submission to that conduct or communication is made a term or condition, either explicitly or implicitly, of obtaining employment ...;
>
> (2) submission to or rejection of that conduct or communication by an individual is used as a factor in decision affecting that individual's employment ...; or
>
> (3) that conduct or communication has the purpose or effect of *substantially interfering with an individual's employment, ... or creating an intimidating, hostile, or offensive employment ... environment.*

Minn.Stat. § 363A.03, subd. 43 (emphasis added).

■ Behavior that is actionable under a "hostile work environment" claim under subdivision 43(3)

> must be unwelcome, must consist of "sexual advances, requests for sexual favors, sexually motivated physical contact or other verbal or physical conduct or communication of a sexual nature," and it must be sufficiently pervasive so as to substantially interfere with the plaintiff's employment or to create a hostile, intimidating, or offensive work environment.

*Cummings,* 568 N.W.2d at 424 (quoting the Minnesota Human Rights Act definition of "sexual harassment"); *see also*

---

6. The district court modified factor three to require that the harassment be "based on sex," instead of requiring that the harassment be "based on membership in a protected group." *See LaMont v. Indep. Sch. Dist. No. 728,* 814 N.W.2d 14, 21 (Minn.2012) (noting that the third factor requires a plaintiff to prove that "the harassment was based on membership in a protected group" (quoting *Goins,* 635 N.W.2d at 725)). In *Cummings,* a sexual harassment case, the supreme court stated that a plaintiff need not "prove that sexual harassment is 'based on sex,' separate and apart from the elements of [the Minnesota Human Rights Act's definition of sexual harassment]." 568 N.W.2d at 420 n. 2. Thus, under *Cummings,* the district court's use of the "based on sex" language for factor three is erroneous. This error is immaterial here as respondents agree that all factors except element four were met, and the record shows—if necessary to prove a successful sexual harassment claim under the human rights act—that the harassment was based on the women's membership in a protected group.

7. The four-factor framework remains from the days before Minnesota expressly defined "sexual harassment" in the act. Indeed, the supreme court has modified this framework consistent with the definition of sexual harassment in section 363A.03, subdivision 43. *See Cummings,* 568 N.W.2d at 420 n. 2 (eliminating the "based on sex" requirement); *Frieler,* 751 N.W.2d at 567 (eliminating the requirement that a plaintiff show that the "employer knew or should have known about the sexual harassment and failed to take timely and appropriate remedial action"). Thus, a question exists as to whether the four-factor framework should be applied in a *sexual harassment* hostile work environment case. We note, however, that the framework has been recently reiterated in a hostile work environment case based on discrimination other than sexual harassment. *See LaMont,* 814 N.W.2d at 21.

*Beach v. Yellow Freight Sys.*, 312 F.3d 391, 396 (8th Cir.2002) (addressing a hostile work environment claim under the act).

■ In assessing whether Zapolski's conduct substantially interfered with the women's employment or created a hostile work environment, we "look at the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Goins*, 635 N.W.2d at 725 (quotations omitted). The work environment must be "both objectively and subjectively offensive in that a reasonable person would find the environment hostile or abusive and the victim in fact perceived it to be so." *LaMont*, 814 N.W.2d at 22; *see also Goins*, 635 N.W.2d at 725.

**B. *Was the Sexual Harassment Sufficiently Severe and Pervasive to Create a Hostile Working Environment?***

■ Applying the statutory standard and these principles, it is clear that Zapolski's conduct was sexual harassment that created a hostile work environment for Rasmussen, Moyer, and Reinhold. First, the conduct was unwelcome. "[T]o find conduct unwelcome, the complaining party must show that [she] neither solicited it nor invited it and regarded the conduct as undesirable or offensive." *See Beach*, 312 F.3d at 396 (quotation omitted). Here, the district court specifically found credible the evidence that "each of the plaintiffs was subjected to coarse sexual talk, gesture, and conduct that they did not welcome." This finding is well supported.

Second, Zapolski's behavior plainly included "sexual advances, requests for sexual favors, sexually motivated physical contact or other verbal or physical conduct or communication of a sexual nature." Minn. Stat. § 363A.03, subd. 43. As the district court found, Zapolski frequently used vulgar sexual language, made sexually derogatory and offensive comments about women, and asked each appellant inappropriate questions of a sexual nature. He inappropriately touched Rasmussen on her buttocks on more than one occasion, as confirmed by a credible witness, and once pushed his crotch into her rear until she screamed "get off me." Zapolski also touched Reinhold on the chest area of her sweater. He brought a *Playboy* magazine into work, showing it to Rasmussen, Moyer, and other employees and comparing the nude model to Rasmussen, and gave an x-rated pornographic video to Rasmussen to watch. The district court's findings as to Zapolski's conduct toward each of the women are not clearly erroneous and sufficiently meet the basic definition of sexual harassment under the statute.

Third, considering the totality of the circumstances, the sexual harassment was sufficiently severe and pervasive to have substantially interfered with appellants' employment, and it created an intimidating, hostile, or offensive employment environment for the three women employees. *See id.; Goins*, 635 N.W.2d at 725. While the district court did "not condone behavior of the type described and endured by plaintiffs," it unreasonably discounted the severity of Zapolski's conduct and, relying on one court of appeals case, *Geist–Miller v. Mitchell*, 783 N.W.2d 197 (Minn.App. 2010), apparently believed that this court has set a "surprisingly high" bar for a plaintiff to meet in a sexual harassment case. Under the factual circumstances of *this* case, however, the district court's ultimate conclusion that the sexual harassment was not actionable is clearly erroneous.

Zapolski's conduct towards Rasmussen, Moyer, and Reinhold more than meets the standard for sexual harassment. No question exists that the conduct was "pervasive." The district court found that Zapolski "frequently" made sexually inappropriate comments to Rasmussen, asked about her sex life, and used vulgar language in her presence; she testified that it occurred at least once a week beginning in early 2009.[8] Likewise, Zapolski subjected Moyer to constant sexually harassing conduct. Within two weeks of Moyer starting work at Lou's, he asked her about her sex life, bragged about his own sex life, and continually made sexually inappropriate comments, using remarkably explicit language. With Reinhold, Zapolski began making offensive comments to her on the very first day that she worked for him, and his explicit sexual remarks continued daily through her six shifts at Lou's.

Zapolski's behavior cannot be construed as anything other than "severe." While the district court downplayed Zapolski's "inappropriate touching" by characterizing it as "infrequent and questionable," its own acceptance of the entirety of the women's allegations and the record show that this finding is clearly erroneous. Zapolski's behavior was physically threatening to both Rasmussen and Reinhold. He touched Rasmussen's buttocks on at least two occasions, once grabbing her from behind and pressing his pelvis against her buttocks until she finally screamed "get off me." This behavior is troubling even if it occurs only once. *See, e.g., Johns v. Harborage I, Ltd.*, 585 N.W.2d 853, 861 (Minn. App.1998) (acknowledging that a single act of sexual harassment can be sufficient to state a hostile work claim under Title VII)

(citing *King v. Bd. of Regents*, 898 F.2d 533, 537 (7th Cir.1990)). Moreover, during the six days that Reinhold worked for him, Zapolski held her hand and led her around the workplace, squeezed her shoulders, and picked wood shavings from her chest.

Similarly, the district court's finding that Zapolski did not "explicitly sexually proposition[ ]" any of the women is not accurate. The record shows that in the short time that Reinhold worked at Lou's, Zapolski asked her if she would kiss him when he came to work, asked her to dinner, and told her that it was a "perfect day to watch a football game on television and make love." Moreover, while Zapolski did not proposition Moyer directly, he pestered her to "hook him up" with her friends or sister, even stating that he would pay for such sex.

Moreover, Zapolski's introduction of inappropriate materials into the workplace further illustrates the severity of his actions in creating a hostile working environment. He gave Rasmussen a pornographic DVD entitled *Squirters 2* and encouraged her to watch it, showed Rasmussen, Moyer, and another employee a nude model in a *Playboy* magazine, and asked their opinion as to whether the model looked like Rasmussen. This behavior was humiliating to Rasmussen as it would be to any reasonable person in her situation.

The district court minimized the effect of Zapolski's incessant explicit sexual comments by stating that it was "widespread throughout the employment setting and not merely directed at females." *Cummings* established that "an employee subject to discriminatory conduct by 'an equal opportunity harasser' is nevertheless pro-

---

**8.** Zapolski's sexually inappropriate behavior began around the same time as Rasmussen's husband was laid off from his job. Rasmus-

sen stayed at Lou's until her husband began to work again in March 2010.

tected by the [Minnesota Human Rights Act]." *LaMont,* 814 N.W.2d at 25 n. 1 (Page, J., dissenting) (quoting *Cummings,* 568 N.W.2d at 422–23).

Moreover, Zapolski's explicit talk was mostly *about* females, and often directed at appellants. He engaged the women in unwelcome conversations that simply do not belong in the workplace, using derogatory language about women. No woman should have to listen to her boss routinely refer to women as "cunts" while she is simply trying to earn a living for her family, even if the term is not being used in reference to her.

Nothing in *Geist–Miller* requires a different result. In that case, the plaintiff had worked for the employer for almost ten years, continued her employment until it was terminated for a non-discriminatory reason, and then, only after her termination, first made allegations of sexual harassment that mainly occurred during the last four months of her employment. 783 N.W.2d at 200–01, 204. The court found that the allegations primarily involved sexual banter and an unsuccessful pursuit of a relationship, and that the employer "took no more invasive action" after his advances were rebuffed. *Id.* at 203–04. Because the conduct was not "physically threatening or intimidating," and it was not shown to have "interfered with appellant's ability to perform her job," the evidence was "insufficient to create a genuine issue of material fact as to whether the harassment was sufficiently pervasive to be actionable." *Id.* at 204.

By contrast, Zapolski's raw and explicit conduct pervaded the workplace and affected the women's employment, in Reinhold's case, from the very first day she was on the job until the day she quit. His behavior did not cease even after Rasmussen and Reinhold told him it was inappropriate and that it made them uncomforta-

ble. Moreover, in the cases of Rasmussen and Reinhold, the sexual harassment included physical touching that both found intimidating and that made them anxious. His behavior went far beyond mere coarse sexual banter and included bringing a pornographic movie to work and comparing one of the women to a nude photo in *Playboy.*

In contrast to the employee in *Geist–Miller,* all of these employees quit jobs that they testified they otherwise liked— and that they needed—because of his actions. In fact, Reinhold lasted only six days on the job because of Zapolski's harassing behavior. The sheer quantity and quality of his sexual conduct goes well beyond mere boorish or chauvinistic behavior, *cf. Geist–Miller,* 783 N.W.2d at 204, or simple teasing or offhand comments, *cf. Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998).

Previous cases under the Minnesota Human Rights Act and Title VII support our conclusion that Zapolski's conduct was sexual harassment that created a hostile work environment. *See, e.g., Bougie,* 504 N.W.2d at 495–96, 498–99 (affirming the district court's finding of sexual harassment where the office atmosphere was "sexually charged," employees used vulgar language and told off-color sexual jokes, and inappropriately touched the plaintiff in a sexual manner); *Beach,* 315 F.3d at 396–97 (affirming the federal district court's finding after a bench trial of a severe and pervasive hostile work environment where the plaintiff was continually exposed to sexually explicit graffiti about himself over the course of four years and the employer failed to remedy the problem after his complaints); *Bales v. Wal–Mart Stores, Inc.,* 143 F.3d 1103, 1106–07, 1109 (8th Cir.1998) (affirming jury verdict on hostile work environment theory where the super-

visor demanded details about the plaintiff's personal life, suggested that he would leave his wife to be with the plaintiff, called the plaintiff at home to say that he missed her, recounted dreams about the plaintiff in sexy attire, made numerous sexual innuendos, and regularly touched the plaintiff's hair and pulled on her smock).

Zapolski's conduct in this case is at least as severe, if not more so, than the conduct found to be actionable in previous cases. Accordingly, the district court's conclusions that appellants failed to prove their claims of sexual harassment are erroneous. We therefore reverse the district court's dismissal of appellants' claims and, upon remand, instruct the court to enter judgment against Two Harbors Fish Co. and BWZ Enterprises in favor of appellants.

### III. Aiding and Abetting

■ Rasmussen, Moyer, and Reinhold also ask us to determine whether Zapolski can be held individually liable for aiding and abetting the sexual harassment of the employers. Because of its finding that appellants' claims did not have merit, the district court declined to rule on this issue:

> Clearly, it was the alleged acts of Zapolski that gave rise to this claim, and if the Court found the existence of actionable harassment under the Minnesota Human Rights Act, it would have found that it was based upon defendant Zapolski's actions. Because the Court found that the alleged conduct in question did not rise to the level of sexual harassment under the [Minnesota Human Rights Act], no such finding is necessary.

In the interests of judicial economy and to provide guidance to the district court upon remand, we now consider appellants' contention.

The act provides that "[i]t is an unfair discriminatory practice for any person . . . [i]ntentionally to aid, abet, incite, compel, or coerce a person to engage in any of the practices forbidden by this chapter." Minn.Stat. § 363A.14. The definition of "person" in the act makes it clear that Two Harbors Fish Company and BWZ Enterprises are "persons" under the statute. Minn.Stat. § 363A.03, subd. 30 (2010) (" 'Person' includes partnership, association, [and] corporation. . . .").

This court recently held that "a person is liable for aiding and abetting a violation of the MHRA when that person knows that another person's conduct constitutes a violation of the MHRA and 'gives substantial assistance or encouragement to the other so to conduct himself.' " *Matthews v. Eichorn Motors, Inc.*, 800 N.W.2d 823, 830 (Minn.App.2011) (quoting Restatement (Second) of Torts § 876(b)). Liability under this standard, however, does not seem logical under the circumstances of this case, where Zapolski is both the sole harasser and the owner and sole shareholder of the corporate employers. *Cf. id.* at 831–32 (analyzing whether the aiding and abetting statute applies to impose individual liability on a supervisor who was aware of another employee's harassing conduct).

Because the corporate entities here are liable under the act only because of their status as "employers," and not because they engaged in any affirmative discriminatory or harassing actions separate from Zapolski's, Zapolski cannot be said to have given substantial assistance or encouragement to them to commit these violations of section 363A.08, subd. 2.[9] As the only

---

**9.** Courts in other jurisdictions, interpreting aiding-and-abetting provisions of human rights statutes substantially similar to Minne-sota's, have also recognized the illogical nature of applying aiding and abetting liability to a person who was the sole perpetrator of

wrongdoer here, Zapolski simply cannot aid and abet his own discriminatory conduct.

Previous case law also suggests that Zapolski cannot be held personally liable under an aiding and abetting theory. In *State ex rel. Beaulieu v. RSJ, Inc.*, this court found that Joseph Schaefer, the majority shareholder of a corporation found liable for discrimination, could not be individually liable for aiding and abetting, even though Schaefer was responsible for the discrimination. 532 N.W.2d 610, 611, 613 (Minn.App.1995), *aff'd as modified*, 552 N.W.2d 695 (Minn.1996). The court concluded:

> The statutory language provides no reason for making aiding and abetting discrimination an exception to the limitation of corporate liability. As a majority shareholder of [the corporation], Schaefer is already liable for its discriminatory acts—the liability of [the corporation] will inevitably affect its shareholders. Thus, we conclude he should not also be held liable as an individual for aiding and abetting those acts.

*Id.* at 613 (citation omitted).

While Zapolski was responsible for the sexual harassment that occurred here, the aiding-and-abetting provision of the act simply does not provide for individual liability in these particular circumstances. Our conclusion that this claim is not available does not necessarily mean, however, that Zapolski may not ultimately be held personally liable for sexual harassment in future proceedings under another theory. For example, the district court may find it appropriate in these circumstances, where Zapolski may well be the alter ego of the corporations, to pierce the corporate veil. *See, e.g., Hoyt Props., Inc. v. Prod. Res. Grp., L.L.C.*, 736 N.W.2d 313, 318–19 (2007); *State ex rel. McClure v. Sports & Health Club, Inc.*, 370 N.W.2d 844, 854 (Minn.1985).

## DECISION

Because we conclude that the district court erred in determining that Zapolski's conduct was not actionable sexual harassment under the Minnesota Human Rights Act, we reverse the judgment of the district court, direct the court to enter judgment in favor of each of the appellants, and remand for the district court to determine compensatory and punitive damages, and to undertake any further proceedings consistent with this opinion that the district court deems appropriate.

**Reversed and remanded.**

---

the harassment. *See Bolick v. Alea Grp. Holdings, Ltd.*, 278 F.Supp.2d 278, 282 (D.Conn. 2003) (interpreting the Connecticut Fair Employment Practices Act and holding that the act's "aiding and abetting liability ... requires that the individual assists another person in discriminatory conduct and a sole perpetrator cannot be held liable"); *see also Perks v. Town of Huntington*, 96 F.Supp.2d 222, 228 (E.D.N.Y.2000) (discussing the New York Human Rights Law and stating that applying individual liability to a sole perpetrator "creates a strange and confusing circularity where the person who has directly perpetrated the harassment only becomes liable through the employer whose liability in turn hinges on the conduct of the direct perpetrator" (quotation omitted)). *But see Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir.1995) (finding allegations sufficient to state an aiding and abetting claim of actionable sexual harassment against individual perpetrators under the New York Human Rights Law).