*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1717**

Lifespan of Minnesota, Inc.,
Respondent,

vs.

Minneapolis Public Schools, Special School District No. 1,
Appellant.

**Filed May 2, 2016
Reversed and remanded
Rodenberg, Judge**

Ramsey County District Court
File No. 62-CV-12-7967

Terrance W. Moore, Carol R. M. Moss, Hellmuth & Johnson, PLLC, Edina, Minnesota (for respondent)

Laura Tubbs Booth, Roseann T. Schreifels, James K. Martin, Booth Law Group LLC, Minnetonka, Minnesota; and Eric J. Magnuson, Katherine S. Barrett Wiik, Robins Kaplan LLP, Minneapolis, Minnesota (for appellant)

Considered and decided by Rodenberg, Presiding Judge; Hooten, Judge; and Randall, Judge.*

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**RODENBERG**, Judge

In this second appeal concerning an ongoing contract dispute, Minneapolis Public Schools, Special School District No. 1 (MPS) appeals a grant of summary judgment in favor of Lifespan of Minnesota, Inc., requiring MPS to pay Lifespan for academic services provided to students living within the MPS district between June 1, 2011 and September 28, 2012. Lifespan cross-appeals, seeking additional payment for services provided after September 2012. Because the district court improperly treated our earlier opinion resolving questions of subject-matter jurisdiction as having established the law of the case concerning material factual issues, and granted summary judgment on that basis, we reverse and remand.

## DECISION

Appellant MPS is required by law to provide education to all children living within its district, including children with mental-health-related disabilities and special needs. Minn. Stat. §§ 123B.02, subd. 2; 125A.15, .51 (2014).[1] Respondent Lifespan is a private, for-profit company. It operates a day-treatment program for children and adolescents whose mental health requires intensive care. *See id.* Lifespan's program has two parts that are programmatically intertwined: mental-health treatment and academic services. The

---

[1] "If a district other than the resident district places [a child with a long-term disability] for care and treatment, the district placing the pupil must notify and give the resident district an opportunity to participate in the placement decision." Minn. Stat. § 125A.15(b). "Before the placement of [a child with a temporary illness or disability] for care and treatment, the district of residence must be notified and provided an opportunity to participate in the placement decision." Minn. Stat. § 125A.51(c).

2

costs of the academic-services portion are typically paid by a child's school district of residence.

Before June 2011, MPS had a policy and practice of contracting with Lifespan to provide academic services to students for whom MPS was responsible based on their residence in the district. The children for whom MPS paid Lifespan for academic services were students who would otherwise be in MPS classrooms or programs. Contracts between MPS and Lifespan were in the form of written tuition agreements, drafted by Lifespan and signed by an agent of MPS.

In the spring of 2011, Ann Casey, executive director of special education for MPS, became concerned about Lifespan's compliance with state and federal education laws. On June 2, 2011, MPS sent an initial notice that it would no longer be signing tuition agreements or otherwise contracting with Lifespan for academic services. MPS based its decision on a determination that it could provide in-house academic services for students with mental-health-related disabilities at a lower cost and with greater regulatory control than by continuing to outsource these services to Lifespan. MPS claims that, between June 2011 and September 2012, it sent 14 letters expressly rejecting Lifespan's offers to contract. MPS claims that it did not sign any tuition agreements after June 2, 2011. MPS also contends that it sent letters to the parents of their students who were enrolled with Lifespan, informing the parents that MPS would no longer pay for academic services at Lifespan and that MPS was prepared to provide those services in its own schools and programs.

3

Lifespan continued to enroll students living within the MPS district in its program, claims to have continued educating those students, and billed MPS accordingly. But MPS did not pay any invoices for tuition agreements offered after June 2, 2011.

In 2012, Lifespan sued MPS and three other school districts for breach of contract based on their refusal to pay for academic services Lifespan claims it provided to their students. The school districts answered Lifespan's complaints and denied any liability to Lifespan. The districts then moved for judgment on the pleadings, arguing, in part, that Lifespan's only option for judicial review of the districts' decisions not to contract with or pay Lifespan was by writ of certiorari to the Minnesota Court of Appeals.

The district court issued an order on May 1, 2013 granting the school districts' motions, concluding that it lacked subject-matter jurisdiction, and dismissing all of Lifespan's claims with prejudice. Although the districts had initially moved for judgment on the pleadings, upon agreement of the parties, the district court "converted the districts' motions in part into motions for summary judgment because it considered factual materials outside the pleadings which the parties submitted." *Lifespan of Minn., Inc. v. Anoka-Hennepin Sch. Dist., et al.*, Nos. 62-CV-12-9082, 62-CV-12-7967, 62-CV-12-8033, 62-CV-12-9218, 2013 WL 6596709 at *2 (Minn. Dist. Ct. May 1, 2013). In a memorandum attached to the May 2013 order, within a lengthy section under the heading "Undisputed Facts," the district court stated that MPS's "decision to stop contracting or paying for academic support services . . . was initially communicated to Lifespan in a letter dated September 28, 2012." *Id.* at *11.

4

"The district court's function on a motion for summary judgment is not to decide issues of fact, but solely to determine whether genuine factual issues exist." *DLH, Inc. v. Russ*, 566 N.W.2d 60, 70 (Minn. 1997). "Accordingly, a [district] court deciding a summary-judgment motion must not make factual findings . . . relevant to disputed facts." *Geist-Miller v. Mitchell*, 783 N.W.2d, 197, 201 (Minn. App. 2010) (citing *DLH*, 566 N.W.2d at 70). Although the district court characterized this finding concerning the initial communication by MPS to Lifespan as an "undisputed fact," it is clear from the record that the fact was and remains disputed. The issue of fact has never been litigated. The district court's apparent "finding" that September 28, 2012 was the date of MPS's first notice to Lifespan seems to be the origin of much of the remaining dispute in this appeal.

Lifespan appealed from the district court's May 2013 order dismissing its suit for want of subject-matter jurisdiction. *See Lifespan of Minn., Inc. v. Minneapolis Pub. Schs. Indep. Sch. Dist. No. 1*, 841 N.W.2d 656 (Minn. App. 2014) (*Lifespan I*). We affirmed in part, reversed in part, and remanded. *Id.* at 663. We affirmed the district court's conclusion that the school districts' decisions to stop contracting with Lifespan were quasi-judicial, and therefore unreviewable except by writ of certiorari. *Id.* at 661-62; Minn. Stat. § 606.01 (2014). But we reversed and remanded for further proceedings concerning Lifespan's "ordinary contract nonpayment claims." *Id.* at 658, 663. We held that claims arising before the specified termination date of any contract not extended or renewed by MPS as the result of the district's quasi-judicial decision to end the contractual relationship are within the district court's subject-matter jurisdiction and should be litigated as breach-of-contract claims. *Id.* at 663. We also held that claims arising after a communicated quasi-judicial

5

decision by the district not to extend or renew a contract are reviewable only by certiorari. *Id.* at 662. As to claims of this sort, the district court lacks subject-matter jurisdiction. *Id.*

In *Lifespan I*, we only considered the viability of Lifespan's claims based on the pleadings and a very limited record. Ours was a "jurisdictional review" and our opinion expressly provided that it was "without prejudice to the case as it may develop," because, as we acknowledged, "[l]itigation in the district court ha[d] not left the pleading stage." *Id.* at 658. In *Lifespan I*, while considering the same limited record that was available to the district court at the time of its May 2013 order, we referred to the September 28, 2012 letter, but did not designate it as an "initial notice" or as an "operative notification date." *Id.* at 659-60.

On remand from this court, and following oral arguments on competing dispositive motions, the district court issued three additional orders (on December 11, 2014; February 9, 2015; and February 10, 2015).[2] In December 2014, the district court entered judgment as a matter of law, ordering that "each district must honor any Tuition Agreements entered into prior to its cutoff notice to Lifespan." *Lifespan of Minn., Inc. v. Anoka-Hennepin Sch. Dist., et al.*, Nos. 62-CV-12-9082, 62-CV-12-7967, 62-CV-12-8033, 62-CV-12-9218, at *9 (Minn. Dist. Ct. Dec. 11, 2014). This December 2014 order made no finding concerning whether such "cutoff notice" was given.

The February 9, 2015 order stated that MPS (along with the other school districts)

> shall honor all Tuition Agreements regardless of whether a
> Tuition Agreement was signed by the district, but there is

---

[2] The three other districts settled or otherwise resolved their remaining disputes with Lifespan after our remand.

> evidence that the district received the Tuition Agreement prior to it notifying Lifespan that it would no longer pay for academic services pursuant to the Tuition Agreement, and evidence that the services described in any unsigned Tuition Agreement were performed by Lifespan. For purposes of this subsection [], the operative notification dates shall be those specified by the Minnesota Court of Appeals in its Decision of January 13, 2014, as follows: . . . Minneapolis – September 28, 2012.

*Lifespan of Minn., Inc. v. Anoka-Hennepin Sch. Dist., et al.*, Nos. 62-CV-12-9082, 62-CV-12-7967, 62-CV-12-8033, 62-CV-12-9218, at *3-4 (Minn. Dist. Ct. Feb. 9, 2015). In adopting "operative notification dates" for each district, ostensibly "as specified by the Minnesota Court of Appeals," the district court misconstrued *Lifespan I*. Our opinion in *Lifespan I* only addressed the scope of the district court's subject-matter jurisdiction over Lifespan's contract claims. And, as discussed above, the original designation of September 28, 2012 as being a date of any particular significance was the district court's own May 2013 order granting summary judgment. At that time, and in the context of summary judgment, fact-finding was inappropriate. *See Geist-Miller*, 783 N.W.2d at 201.

On September 11, 2015, the district court (the case having been assigned to a different judge on remand) granted Lifespan's new summary-judgment motion against MPS, reiterating September 28, 2012 as the operative notice date. *Lifespan of Minn., Inc. v. Minneapolis Pub. Schs. Indep. Sch. Dist. No. 1*, No. 62-CV-12-7967, at *3 (Minn. Dist. Ct. Sept. 11, 2015). The September 2015 order required MPS to pay the claimed damages for each student as to whom MPS received notice before September 28, 2012 and for which student Lifespan had provided academic services. *Id.*

7

The September 2015 order purports to find that "there is no dispute" that "the Tuition Agreements were received by [MPS]," "that [Lifespan] provided the services," and "that [MPS] accepted them." *Id.* at \*4. But it is clear that the parties *do* dispute these factual issues. And summary judgment is only appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is *no genuine issue of material fact* and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03 (emphasis added). "[A] court deciding a summary-judgment motion must not make factual findings . . . relevant to disputed facts." *Geist-Miller*, 783 N.W.2d at 201. Reviewing the district court's grant of summary judgment de novo, *Gagliardi v. Ortho-Midwest, Inc.*, 733 N.W.2d 171, 175 (Minn. App. 2007), the grant of summary judgment was erroneous.

The second district judge assigned to the case seems to have recognized the conflict between the fully developed record and the perceived constraints of the earlier decisions of both the district court and this court. The September 2015 order stated:

> The Court has waded through the evidence submitted by both parties for the motion of July 1, 2015 and has struggled with the straight-jacket imposed by previous orders. However, for better or worse, it stands in the shoes of [the original district judge]: it is not an appellate court. The *law of the case* (both in [the district court]'s and the Court of Appeals decisions) has set the cut-off date as September 28, 2012, and this Court is bound by those holdings.

*Lifespan*, No. 62-CV-12-7967, at \*3 (emphasis added). The September 2015 order relies entirely on the law-of-the-case doctrine to support its adoption of September 28, 2012 as the initial or operative notice date. As discussed, there are fact issues that remain

8

unresolved concerning when MPS first communicated its decision to discontinue contracting with Lifespan.

The law-of-the-case doctrine is a discretionary method for avoiding the relitigation of an issue that has already been determined on the merits. *Loo v. Loo*, 520 N.W.2d 740, 744 n.1 (Minn. 1994). "Law of the case applies when the appellate court has ruled on a legal issue and remanded for further proceedings on other matters. The issue decided becomes 'law of the case' and may not be relitigated in the [district] court or reexamined in a second appeal." *Sigurdson v. Isanti County*, 448 N.W.2d 62, 66 (Minn. 1989) (quoting *Mattson v. Underwriters at Lloyds*, 414 N.W.2d 717, 719-20 (Minn. 1987)). It is not normally applied by a district court to its own prior decisions. *Loo*, 520 N.W.2d at 744 n.1.

MPS argues that the district court erred in relying on the law-of-the-case doctrine to adopt the September 28, 2012 "operative notification date," and in granting Lifespan's summary-judgment motion. MPS contends that its quasi-judicial decision to no longer contract with Lifespan occurred in the spring of 2011, and that it gave initial notice of its decision to Lifespan on June 2, 2011. MPS argues that all claims arising after its quasi-judicial decision are unreviewable under *Lifespan I*. MPS claims that it expressly rejected each offer after that date, all of which were presented in the form of a written tuition agreement, and that it did not assent to any contract with Lifespan after that date.

Lifespan argues that MPS's conduct between June 2, 2011 and September 28, 2012 demonstrated its assent to Lifespan's offers. Lifespan also argues that MPS's conduct overrides any written notice it might have given to Lifespan, which continued to provide

9

services to MPS students between those dates (for which MPS has not paid). Alternatively, Lifespan argues that it should be allowed to pursue quasi-contract claims under the theory of quantum meruit in any instance where its contract claims are rejected.

The record, as it has developed through discovery and further motion practice, makes clear that the September 28, 2012 letter was not the *initial* notice by MPS of its decision to no longer contract with Lifespan. MPS claims to have first notified Lifespan of its decision on June 2, 2011. The September 28, 2012 notice appears to us to have been the fourteenth of at least 16 such letters, each pertaining to a child or group of children. But *when* MPS first communicated its quasi-judicial decision to discontinue contracting with Lifespan remains an unresolved factual issue.

We reiterate our earlier holding that any claim alleging a contract, written or implied—or, in the same way, a quasi-contract—formed after MPS's communicated decision to stop contracting with Lifespan is not within the subject-matter jurisdiction of the district court. *Lifespan I*, 841 N.W.2d at 661-62. Remaining for resolution is the factual question of when that decision was communicated to Lifespan. This fact issue has never been litigated or determined on its merits—and certainly not by this appellate court. *See Whitaker v. 3M Co.*, 764 N.W.2d 631, 640 n.1 (Minn. App. 2009) ("our role as an error-correcting court does not extend to making factual findings in the first instance"). The district court erred in looking to *Lifespan I* for the resolution of disputed fact issues, because *Lifespan I* addressed only the question of subject-matter jurisdiction.

We reverse the grant of summary judgment and remand for further proceedings: (1) to determine as a matter of fact the initial notice date of MPS's decision to cease

10

contracting with Lifespan; and, (2) to determine if there are any remaining breach-of-contract claims on which Lifespan may recover in district court as provided by our opinion in *Lifespan I*. 841 N.W.2d at 662-63. The only contract claims on which MPS can be liable are those, if any, for which there is a written agreement that was signed by an agent of MPS before the initial notice date, and which has not been fully paid through the termination date on the written agreement.

**Reversed and remanded.**